290 F.2d 51
 UNITED STATES of America, Appellee,
v.
James SANTORE, Peter Casella, Emilio D'Aria, James Leo Massi, Joseph Paul Lo Piccolo, Anthony Edward Tarlentino, Nicholas Narducci, and Lorenzo Orlando, Appellants.
 No. 206.
 Docket 25330.
 United States Court of Appeals Second Circuit.
 Argued January 22, April 7, April 9, 1959.
 Decided October 2, 1959.
 Upon Rehearing In Banc No. 380, Docket 25330.
 Argued March 16, 1960.
 Decided November 16, 1960.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Arthur H. Christy, U. S. Atty., Southern District of New York, New York City (William Desmond Walsh, Spec. Asst. U. S. Atty., Kevin Thomas Duffy and George I. Gordon, Asst. U. S. Attys., New York City, of counsel), for appellee on original hearing.
 S. Hazard Gillespie, Jr., U. S. Atty., (Morton S. Robson, Chief Asst. U. S. Atty., Kevin Thomas Duffy and George I. Gordon, Asst. U. S. Attys., New York City of counsel), for appellee on rehearing.
 Thomas A. Shaw, Jr., Florence M. Kelley, New York City, Harry A. Phillips, Jr., New York City, of counsel for appellants Santore and Orlando.
 Jacob Kossman, Philadelphia, Pa., for appellant Casella, on original hearing.
 Sanford Shmukler, Philadelphia, Pa., for appellant Casella, on rehearing.
 Curran, Mahoney, Cohn & Stim, New York City (Allen S. Stim and Menahem Stim, New York City, of counsel), for appellants D'Aria and Massi.
 Maurice Edelbaum, New York City (Chester E. Kleinberg, New York City, of counsel), for appellant Lo Piccolo.
 Stuart H. Johnson, Jr., New York City, Florence M. Kelley, New York City, Anthony F. Marra, New York City, for appellants Tarlentino and Narducci.
 Opinions of the Panel
 Before HAND and WATERMAN, Circuit Judges, and BYERS, District Judge.
 WATERMAN, Circuit Judge.
 
 
 1
 On February 5, 1958 an indictment was filed in the Southern District of New York charging all of the appellants herein and three others with violations of 21 U.S.C.A. § 173[1] and § 174.[2] Count One of the five count indictment alleged that Peter Casella, James Santore, Emilio D'Aria and James Leo Massi sold 17 ounces, 161 grains of heroin on October 21, 1957. Count Two charged Peter Casella, Joseph Paul Lo Piccolo, James Santore and Ignazio Lawrence Orlando with the sale of 16 ounces, 390 grains of heroin on December 11, 1957. In the third count Peter Casella and James Santore were accused of selling 9 ounces, 197 grains of smoking opium on December 19, 1957. Nicholas Narducci, Anthony Napolitano, Ignazio Lawrence Orlando, Anthony Edward Tarlentino and Nicholas Tolentino were charged in Count Four with the possession on January 21, 1958 of 6 pounds, 6 ounces, 302 grains of heroin. And the fifth and last count charged all of the above and Lorenzo Orlando with conspiring from September 1957 through January 1958 to conceal, possess, buy, and sell a quantity of narcotic drugs, the exact amount and nature thereof being unknown. The indictment also listed thirty-two overt acts alleged to have been undertaken in pursuance of the conspiracy charged in Count Five.
 
 
 2
 Anthony Napolitano and Nicholas Tolentino were not apprehended. The remaining indictees waived a jury and went to trial on June 3, 1958 before a district judge sitting without jury. On July 3, 1958, after seventeen days of trial, the court found each of the defendants guilty as charged. All but Ignazio Lawrence Orlando are contesting their convictions on this appeal.
 
 
 3
 The facts of this case are lengthy and involved, spelling out as they do the sordid story of large scale trafficking in narcotics, but as the appellants contend that there was insufficient evidence to support their convictions, and as Santore presents to us the defense of entrapment, rejected below, we must go into the facts in some detail. The district court accepted the testimony of the Government's witnesses throughout, even where their testimony was contradicted by defense witnesses, and since from our perusal of the record that acceptance seems reasonable enough, we state the facts as they were presented at trial by the Government.
 
 
 4
 Michael Picini, an agent of the Federal Bureau of Narcotics, first met Santore on February 26, 1957 at the 39th Ward Independent Republican Club in Philadelphia, Pennsylvania. Picini introduced himself as an out-of-town narcotics peddler, mentioned the name of a friend of Santore in Baltimore, and expressed a desire to buy a sample quarter kilo of heroin. After at first stating that "his people wouldn't sell less than a half kilo," Santore finally fixed a price of $3,500 for a quarter kilo and told Picini to let him know when he was ready to buy. Subsequently, at a second meeting on March 4, 1957, Santore reintroduced the subject of narcotics by asking Picini if he was still interested in purchasing heroin.
 
 
 5
 On March 8, Santore introduced Picini to Frank Valli, a Philadelphia drug trafficker. At that time, however, no agreement to purchase was made. On March 20, Picini introduced another agent, Eugene Marshall, to Santore and Valli, describing him as his partner. During the evening of the 21st arrangements were made for the purchase of six ounces of heroin, and the agents gave Santore an agreed price of $3,150. Two days later, following Santore's instructions, the agents picked up the drugs. A second sale consisting of one-sixth of a kilo of heroin was made on April 3.
 
 
 6
 After the second sale the agents told Santore that they were dissatisfied with the quality of the drugs they were receiving, and he thereupon introduced them to another local trafficker, Frank Malfi. Following this meeting two purchases of heroin, one-quarter of a kilo on July 25 and one-half kilo on August 22, were made through Santore and Malfi.
 
 
 7
 Picini and Marshall advised Santore that they still were not satisfied with the drugs being supplied them by Philadelphia peddlers, and insisted that Santore take them directly to his New York "connection." Santore did not respond to the agents' demand immediately but finally offered to make the introduction in return for $2,000. On October 16, 1957, Santore introduced the agents to Peter Casella, who offered to supply them with any amount of pure heroin they desired. He stated that this pure heroin could be supplied in "amounts anywhere from half a kilo to a ton * * * with the quality just as it comes off the boat" and he set its price at $11,000 a kilo. After some discussion Casella instructed the agents to meet him on October 21st at the Hotel Lexington in New York City. The agents were to park their automobile in the parking lot across the street from the hotel and the heroin was to be placed in it.
 
 
 8
 About 4:30 P.M. on October 21, Santore and Casella were seen conversing with Emilio D'Aria in front of the Hotel Lexington. After a brief discussion Santore and D'Aria entered D'Aria's car and drove off together.
 
 
 9
 At 6:00 P.M. Marshall arrived at the parking lot and was met by Santore who gave him a package from his pocket containing one-half of a kilo of pure heroin. After Marshall placed the package in the trunk of his car, he informed Santore that he was then unable to pay for it because Picini, who had the funds, was in a Trenton hospital. This story was repeated to Casella in the hotel cocktail lounge. He at first insisted that the drugs would have to be removed from the car and returned to him, but, after the problem was discussed over dinner at a restaurant, Casella finally agreed that Marshall could keep the drugs on consignment if Casella's "New York partners" gave their consent to it.
 
 
 10
 Casella left Marshall and Santore to wait while he went to see his partners, and was followed to the Paddock Bar on Broadway. He seated himself at the bar and a government agent sat down one stool away. D'Aria and James Leo Massi then entered the bar, joined Casella, and engaged in conversation with him.
 
 
 11
 After an initial greeting, Casella said: "I don't have the money. One of them got sick and his partner came alone." D'Aria then asked, "Where is the package now?" — and Casella replied, "It's in the trunk of their car on the East Side. They're good for the money." There was still some hesitation on Massi's part, and Casella then stated, "Look, they're going to give me the money tomorrow. You come down on Wednesday and you'll get your money." After the three had apparently agreed to Casella's plan, the seated agent got up and left the bar.
 
 
 12
 After some additional twenty minutes of conversation Casella, still under surveillance, left the Paddock Bar and returned to Marshall and Santore. He told them that he had convinced his partners that Marshall could keep the package, but that full payment for it must be had by October 23 when the partners were going to Philadelphia for their share of the purchase price.
 
 
 13
 October 23 Marshall met Santore in Philadelphia and told him that in order to get the money he and Casella would have to accompany Marshall to where Picini was staying, at the King Kole Motel in New Jersey. The agent and Santore then picked up Casella at a flower shop in Philadelphia. At first Casella did not want to leave with them, for he was expecting the arrival of his partners from New York, but he finally agreed, and the three drove to the King Kole Motel. There Picini paid Casella $5,500 for the narcotics and paid Santore an agreed-upon $1000 bonus, in lieu of the promised $2,000.
 
 
 14
 On that same day agents followed D'Aria and Massi from New York to Philadelphia where they went directly to the flower shop. There they waited for Santore and Casella until the latter two returned from New Jersey.
 
 
 15
 During the month of November the agents and Santore and Casella discussed the possibility of a partnership for the sale of opium — from Turkey and the best available "called red Turkey smoking opium" — but nothing came of the discussions. The agents desired to see an opium "sample," but Santore indicated a delivery of one would be delayed. Toward the end of that month, however, at Santore's urging, tentative arrangements were made for another purchase of heroin.
 
 
 16
 In New York, on December 10, the two agents met with Santore and Casella at the Hotel Edison to discuss the details of this heroin purchase. At dinner that evening at a restaurant Casella announced that he had to call his "connection." After telephoning, he stated that his connection would be there shortly, and that the connection was the same person who had supplied the heroin for the October 21 sale. Soon Joseph Lo Piccolo entered the restaurant and Casella joined him immediately. After some discussion with Lo Piccolo, Casella returned to the table and said that everything had been arranged and that all he needed to know was the quantity to be delivered.
 
 
 17
 The next day Picini told Casella that he wanted to purchase another half kilo, and the latter said that he would see his connection about it. Casella was then followed to the apartment house where Lo Piccolo had an apartment. He remained inside the building for half an hour. Upon his return to the hotel where Santore, Marshall and Picini were waiting he said that the drugs would be delivered that evening at 9:00 P.M. It was agreed that the drugs were to be placed in a bureau drawer in the agents' room at the Hotel Edison while they were absent from it. To enable the delivery to be made in this manner Marshall gave Casella his room key, and the latter said that he would "give the key to his people." Casella then proceeded to the same apartment building that he had entered earlier in the day, and upon his return told Marshall that he had given the key to his supplier and that the delivery would be on schedule.
 
 
 18
 At 9:00 P.M. that evening Ignazio Lawrence Orlando entered the hotel, went to the agents' room, unlocked the door, entered, and closed the door behind him. A few minutes later he came out of the room and left the hotel. As he went by Casella and Marshall, who were standing outside, Casella said "Everything is all right, the stuff is in the room." Ignazio Orlando then got into a car in which Lo Piccolo was already seated and drove to the latter's apartment building. There Orlando alighted, went into the basement garage, got into his own car, and drove away. Lo Piccolo drove off in the car they both had been in.
 
 
 19
 No one had gone into the agents' room except Ignazio Orlando. When the agents looked in the bureau they found a package containing a half-kilo of heroin. Picini then, at Casella's direction, gave $6,000 to Santore.
 
 
 20
 On December 18 Santore informed Marshall that the opium sample was now "in New York." The next day Marshall picked up Santore and Casella in Philadelphia and drove them to New York City. En route Casella stated that he could now supply raw opium at $1300 a kilo, or smoking opium at $450 per four ounce can. In New York Casella said that he had to go to his connection's home to get the samples. He fixed a $900 price to be paid to Santore. Picini paid Santore, Casella and Santore were then followed to Lo Piccolo's apartment house, and Casella went to the door of apartment 7K where Lo Piccolo lived. Although Casella was not observed after he stopped in front of the door of 7K, a doorbell rang, voices were overheard, and a minute later Casella had disappeared from the corridor. Some minutes later Santore, who had remained on the ground floor in the lobby, came out of the building with Casella and gave Marshall two cans of prepared opium.
 
 
 21
 Tentative plans were made between Marshall and Picini and Casella and Santore on January 3, 1958 for the sale of additional heroin and opium, and on January 8 an advance payment of $1500 was made by Picini to Santore at Casella's direction. Arrangements were then made looking toward January 21 as the tentative date for a delivery of these drugs by the New York connection to Santore; Santore was to then transport them to the agents at the King Kole Motel.
 
 
 22
 About 7:00 P.M. on January 20th Ignazio Orlando drove to the home of his father, Lorenzo Orlando, at 164 Hill Street, Elmont, Long Island. A minute or two after he entered the house a light flashed on in the attic and remained on for about two minutes. Shortly thereafter Ignazio Orlando emerged from the house carrying a package similar in appearance to another package he had been observed delivering to Lo Piccolo's apartment a few hours earlier. Ignazio Orlando put the package in his car, drove to a place in the Bronx, parked his car, met Anthony Napolitano and transferred the package to the trunk of the latter's parked car. Orlando then drove off and Napolitano walked away.
 
 
 23
 Later that evening Anthony Edward Tarlentino and Nicholas Narducci were observed in the former's car, driving back and forth past Napolitano's car, and then parking for about twenty minutes across the street from it. Tarlentino then drove off and parked again a block away. Narducci emerged and after walking past Napolitano's car to the next corner walked back to it and began to open its trunk. Just as he was doing so, and was starting to lift out the package, federal agents drove by. Narducci released the package, closed the trunk, and returned to Tarlentino's car. They then drove away.
 
 
 24
 Tarlentino dropped Narducci off in Manhattan and then proceeded to the Bronx where he entered a bar and met Napolitano and Nicholas Tolentino. Tarlentino was overheard by an agent to say, "the kid got scared and left the package in the car" and according to the agent Tolentino replied that "they would look around, and when it looked all right, they would take the stuff away." Early the next morning Tolentino and Napolitano attempted to drive Napolitano's car away. Federal agents tried to apprehend them and gave chase. The defendants escaped, but the agents recovered the car. The package in the trunk was found to contain six and one-half pounds of pure heroin — 2.94 kilograms.
 
 
 25
 Tarlentino and Narducci were arrested on the morning of January 21, and, in the custody of the agents, gave inconsistent accounts of their actions of the night before. Tarlentino stated that he took Narducci with him to a bar to keep a date with a young lady, but not finding her at the appointed place he took Narducci directly home and then returned to the bar. Narducci claimed that he had followed Tarlentino's instructions in attempting to pick up the package, and that he was unaware of its contents. When he saw the agents he thought they were police and became frightened. After making these statements, however, Narducci admitted that everything he was saying was untrue.
 
 
 26
 On January 22, at about 9:15 P.M., Ignazio Orlando and Lo Piccolo went to the home of Lorenzo Orlando. Shortly after the two men entered the side door of the house a light went on in the attic for a brief period. A few minutes later the two men came out of the house together, placed a package in the trunk of Ignazio Orlando's car, and drove away. Agents attempted to follow, but soon had to discontinue surveillance.
 
 
 27
 About 2:00 A.M. on January 23, Santore arrived at the King Kole Motel on the Black Horse Pike in New Jersey. On instructions from Santore, Marshall picked up a package from the back seat of Santore's car similar in size and shape to the package Lo Piccolo and Orlando had placed in Orlando's car several hours earlier. The package Marshall received was found to contain almost eleven pounds of pure heroin and four jars of smoking opium. Santore asked for $8,000 and was then arrested.
 
 
 28
 Lo Piccolo on January 23, at 4:30 A.M., was also placed under arrest and was handed a copy of a search warrant for his apartment. He denied that he knew Ignazio Orlando and stated that during the evening he had just been around the city — "nowhere in particular." The agents discovered in Lo Piccolo's apartment some eight to twelve hundred dollars, and he had a map of New Jersey with the penciled notation, "Haverton four miles, Black Horse." Ignazio Orlando was also apprehended that morning when he arrived at his home.
 
 
 29
 At about the same time that Lo Piccolo and Ignazio Orlando were being arrested, agents armed with a search warrant went to the side door of Lorenzo Orlando's home. When Lorenzo came to the door he was shown a copy of the search warrant and the agents proceeded upstairs to the attic. After searching two small attic bedrooms in the presence of Orlando and his wife, the agents discovered a locked door in the bathroom. Orlando attempted to dissuade the agents from opening that door by stating that it was the bedroom of a tenant, by denying that he had a key, and, finally, by placing himself between the agents and their objective. However, the agents forced open the door and discovered, instead of bedroom furnishings, a steamer trunk, and on it a suitcase containing over nineteen pounds of pure heroin and one pound of opium. When asked about this discovery Lorenzo Orlando stated that the contents of the suitcase were indeed narcotics and admitted ownership. Within the trunk was a complete set of laboratory equipment for the dilution and preparation of narcotics. An agent searching the basement of the house located a box containing a number of empty glassine bags, some of which contained traces of heroin. And while one of the agents was passing to Orlando clothing which he had indicated he wanted to wear, the agent discovered in the pocket of the overcoat a skeleton key which opened the lock of the attic room.
 
 
 30
 When Lorenzo Orlando was subsequently interrogated he was unable to give the last name of the alleged tenant who was supposed to have occupied the attic room. And, although the door to the attic room led off the bathroom which the Orlandos apparently used, Lorenzo Orlando admitted that he had not told his wife that anyone was living in the room.
 
 
 31
 This then, in the main, is the background of the case. Certain contentions of the appellants require a more complete statement of particular facts, but that can best be deferred until the point in question is discussed. Each of the appellants makes various individual arguments; and all, in conclusion, incorporate, where applicable, the arguments of the others.
 
 I. The Sufficiency of the Evidence
 
 32
 Section 174 of Title 21 makes it a crime for any person to receive, conceal, buy, sell or in any manner facilitate the transportation, concealment or sale of any narcotic drug imported contrary to law when that person has knowledge of that narcotic drug's illegal importation. Torres Martinez v. United States, 1 Cir., 1955, 220 F.2d 740; Kalos v. United States, 8 Cir., 1925, 9 F.2d 268. The section also states that it shall be a crime to conspire, apparently with the same knowledge, to commit any of these activities. And, as an aid to the enforcement of this section, Congress has provided that "[w]henever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."
 
 
 33
 A. Peter Casella.
 
 
 34
 We have no difficulty in determining that the defendant Peter Casella actively participated in the sales of narcotics and that he was a member of a conspiracy dealing with narcotic drugs. And, as to Count Three, wherein he was charged with a sale of smoking opium on or about December 19, 1957, there was sufficient evidence to support a finding that the opium then sold was illegally imported and that Casella knew it. In November Casella told the agents that through connections with a smuggler he could get them opium from Turkey, and, at dinner on December 11, he stated that while the opium was in port it had not yet been unloaded. Too, just before the sale, on December 18, Santore told Agent Marshall that the opium sample was now in New York.
 
 
 35
 However, as to Counts One and Two, charging sales of heroin, there is no evidence in the case that the heroin was illegally imported or that defendant knew it to be contraband. The Government recognizes this inadequacy of its proof, and it urges us to rely upon the statutory presumption, contained in section 174. It argues that even though it was not shown that Casella ever physically held the heroin, or had personal custody of it, his position in the conspiracy was such that he had the "possession" the statute contemplates. Defendant, of course, takes the opposite view. He contends that he did not have actual possession of the heroin and therefore the presumption cannot operate against him with respect to it.
 
 
 36
 We have on two occasions indicated that personal custody or manual possession of narcotics by a defendant is not essential in order to bring the presumption into operation against him — that is, the drugs may physically be held by one person and possession still be in another. United States v. Moia, 2 Cir., 1958, 251 F.2d 255; United States v. Cohen, 2 Cir., 1941, 124 F.2d 164, certiorari denied Bernstein v. United States, 1942, 315 U.S. 811, 62 S.Ct. 796, 86 L. Ed. 1210. And see Gallegos v. United States, 10 Cir., 1956, 237 F.2d 694. While these decisions are not, perhaps, conclusive authority, for they deal with this issue in passing and without extended discussion, we follow them. The view they indicate to be the sound one is in accord with what we consider to be the proper and reasonable interpretation of the word "possession" as it is used in this particular statute. So interpreted, "possession" includes not only immediate physical control but also that control which is exercised through agents.
 
 
 37
 It is well recognized both in civil and criminal law that the word "possession" may encompass both types of control. See, e. g., National Safe Deposit Co. v. Stead, 1914, 232 U.S. 58, 34 S.Ct. 209, 58 L.Ed. 504; People v. Brenneauer, 1917, 101 Misc. 156, 166 N.Y.S. 801; Commonwealth v. Smith, 1958, 187 Pa. Super. 1, 144 A.2d 253; Bennett Chevrolet Co. v. Bankers & Shippers Ins. Co., 1937, 58 R.I. 16, 190 A. 863, 109 A.L.R. 1077; Reynolds v. Roberts, 1885, 57 Vt. 392; Black's Law Dictionary (4th Ed. 1951). And while it is true that we should strictly construe criminal statutes, we are surely permitted to define a term that has long had a recognized meaning in the law in a manner consistent with that recognized definition.
 
 
 38
 Moreover, it should be remembered that this presumption, which greatly favors the Government, was written into the section because Congress undoubtedly believed that drug trafficking should be stamped out, and that convictions of persons engaging in that traffic should be more easily obtained. Also, section 174 makes possible the imposition of the same heavy penalties provided for in that section upon those found guilty of conspiring to engage in the illicit drug traffic as upon those found guilty on substantive counts. This clearly indicates a Congressional belief that all the members of a narcotics conspiracy, not only those caught "red handed" concealing, buying, selling and transporting the drugs, have equally outraged society. Therefore we would be stultifying the Congressional intent if we should hold that Congress intended the word "possession" in this statute to be defined so as to secure easier convictions of only those members of a conspiracy, often few in number, who are shown to have had personal custody of the narcotics.
 
 
 39
 Defendant Casella points to 26 U.S.C. §§ 4704(a), 4705(a), and 4721-4724, sections of the Internal Revenue Code of 1954, and argues that since convictions can be obtained under these provisions without proof that the narcotics were imported contrary to law to the defendant's knowledge, section 174 should not be interpreted as we are now interpreting it. Any thought that Congress intended these Internal Revenue provisions as a substitute for 21 U.S.C.A. § 174 is defeated by 26 U.S.C. § 4734, which provides:
 
 
 40
 "Nothing contained in sections 4701 to 4707, inclusive, or sections 4721 to 4726, inclusive, shall be construed to impair, alter, amend, or repeal any of the provisions of the act approved February 9, 1909, entitled `An Act to prohibit the importation and use of opium for other than medicinal purposes' (c. 100, 35 Stat. 614; 21 U.S.C. 171-185), * * and any amendment thereof." This presumption of illegal possession of imported narcotics so set forth in 21 U.S.C.A. § 174 casts the burden of going forward upon the accused to disprove importation, but it does not appear that our interpretation of this statutory presumption endangers its validity. In Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 471, 69 L.Ed. 904, the Supreme Court, in dealing with a provision couched in almost identical language, set out the following canon:
 
 
 41
 "`That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.'"
 
 
 42
 It is just as "rational" and "reasonable" to infer the fact that narcotics are contraband, and that defendant had knowledge thereof, from the fact that defendant had control over them while held by another, as it is to so infer because a defendant had personal or physical custody of them.
 
 
 43
 The question we must therefore answer with respect to Casella's conviction under Counts One and Two is whether the Government presented evidence sufficient to support a finding that Casella was in a position to exercise control over the heroin sold on October 21, and on December 11, 1957. While it is clear that Casella was not in sole control of the heroin sold on those dates we think it equally clear that, together with others, he exercised some dominion over it. Casella was a full partner in the conspiracy, not simply a hired agent, and he had at least partial control over what was to be done with the contraband handled by the group. A clear illustration of his position can be seen in the events of October 21. When Marshall was unable to pay for the drugs delivered, Casella, in conjunction with his "New York partners," was able to let them go on consignment. And there is no reason for believing that this control, exercised as a result of his role in a continuing conspiracy, did not extend to the narcotics subsequently handled by the group. In our opinion Casella was, for purposes of section 174, in possession of heroin on the dates charged in Counts One and Two of the indictment. Since he made no attempt to "explain" his possession on those dates he was properly convicted.
 
 
 44
 And inasmuch as the proof of his activities that supports the Government's case on Counts One, Two and Three is also applicable to the conspiracy charge under Count Five, we also affirm the Count Five conviction.
 
 
 45
 B. James Leo Massi and Emilio D'Aria.
 
 
 46
 The main evidence against the defendants Emilio D'Aria and James Leo Massi is the testimony of the Narcotics Agent with respect to the conversation which he stated that he overheard between those defendants and Casella in the Paddock Bar on October 21, 1957. Both D'Aria and Massi took the stand and denied the conversation testified to by the agent, but, as we have stated above, the district court chose to believe the agent. Taken in connection with the other testimony properly bearing upon their guilt, and in context, this conversation was properly interpreted as showing the participation of D'Aria and Massi in the sale of heroin on that day and their membership in the overall conspiracy. Less than two hours before the scheduled delivery on October 21st D'Aria met Santore at the place of transfer. After a brief conversation D'Aria and Santore drove away. An hour later Santore returned with the package of drugs in his possession. Immediately after Casella told these defendants in the bar that they would have their money by October 23rd Casella returned to the agents and told them to make payment to him by that date. Also, there is the trip to Philadelphia by D'Aria and Massi and the meeting with Santore and Casella on the date when the agents made payment for the October 21 delivery. While it is true that this evidence only relates to the first sale undertaken by the group, and only establishes that these defendants were at that time members of a conspiracy, they made no attempt to show that they ceased thereafter to be members.
 
 
 47
 There is no evidence proving that D'Aria and Massi had knowledge that the heroin was contraband, but the import of their conversation reveals that these two defendants, like Casella, exercised proprietary control over the narcotics. This is especially clear when the Paddock Bar conversation is viewed in the light of Casella's references to his "partners" — hearsay statements admissible against D'Aria and Massi because of the established joint enterprise. Under the rationale stated above with respect to the defendant Casella, it is clear that these two defendants had "possession" of the heroin prior to the time when it was turned over to Agent Marshall. And, under section 174, they, therefore, had the duty of going forward and establishing their innocence. This they failed to do.
 
 
 48
 C. James Santore.
 
 
 49
 With respect to Count Three charging a sale of smoking opium on December 19, 1957, there is direct proof of the guilt of James Santore. He took an active part in making arrangements for the sale and in the transaction itself, and the requisite knowledge of the illegal importation is established by the fact that he was present when Casella mentioned that he could get opium from Turkey through his connection with a smuggler. Similarly, there was evidence to establish Santore's guilt under Count Five, the conspiracy charge, to the extent that he was a member of a conspiracy to sell opium knowing it to have been imported contrary to law.
 
 
 50
 As to Count One, charging a sale of heroin on October 21, 1957, Santore's conviction, like the convictions of Casella, D'Aria and Massi, is affirmed because he did not overcome the statutory presumption contained in section 174. He physically delivered the heroin sold on that date to Agent Marshall, and had unquestioned possession of it.
 
 
 51
 Santore's conviction under Count Two, however, must be reversed. There is no evidence showing that he had possession of the heroin sold on December 11, or that he knew it was contraband. Unlike the transaction of October 21st, Santore did not actually deliver the December 11 drugs; and, as far as the record reveals, he was not a member of the conspiracy in the sense that he had a voice in deciding, or could control, what was to be done with the narcotics. On the contrary, Santore functioned only as an intermediary between the agents, as purchasers, and Casella and his partners, as sellers. For instance, on October 21 when Agent Marshall was trying to defer payment for the heroin delivered to him, Santore's permission was not sought. The defendant was, without question, an active member in the criminal conspiracy but his membership therein was not such that, absent physical custody of the drugs, he exercised that type of control over them and their disposition which we hold constitutes possession.
 
 
 52
 D. Joseph Lo Piccolo.
 
 
 53
 The defendant Joseph Lo Piccolo was indicted under Count Two for engaging in a sale of heroin on December 11, 1957, and under Count Five for being a member of the narcotics conspiracy. Despite his vehement protestations to the contrary, there is no doubt in our minds that the Government established his participation in that sale and that he was a member of a drug peddling conspiracy. At dinner on the evening of December 10th, Agents Marshall and Picini and defendants Santore and Casella were discussing a purchase of heroin. During dinner Lo Piccolo entered the restaurant, and Casella left the table to talk with him. When Casella returned to the table he was able to state to the agents that everything concerning the proposed transfer of the narcotics had been arranged. The next morning when Casella learned the amount of heroin the agents desired he went to the apartment building where Lo Piccolo lived; and upon his return he stated that the heroin would be delivered at 9:00 that night to the agents' hotel room. Also, the agents' room key was taken by Casella to that building. That evening, upon leaving the hotel after delivering the drugs, Ignazio Orlando got into an automobile in which Lo Piccolo was seated, and drove that car to where his own car was parked in the basement garage of Lo Piccolo's apartment building. These events tie Lo Piccolo into the transaction of sale of December 11. Thereafter, on December 19, Casella went to Lo Piccolo's apartment to pick up opium and was overheard talking to someone in the apartment. On January 20, Ignazio Orlando carried into that apartment a package similar in shape and wrapping to other packages taken from the drug cache in Lorenzo Orlando's home. Immediately after the package arrived Lo Piccolo closed his window blinds. The last significant date before Lo Piccolo's arrest was January 22. That evening Lo Piccolo went with Ignazio Orlando to the home of the latter's father. A light went on and off in the attic, and shortly thereafter the two emerged carrying a package identical in size and shape to the one in which drugs were discovered in New Jersey a few hours later. On being arrested the following morning, the marked map and the money were found in his apartment, and he denied knowing the defendant Ignazio Orlando. A trier of facts is not limited to drawing only those inferences most favorable to the accused, United States v. Moia, 2 Cir. 1958, 251 F.2d 255. And when all of these various incidents of proof are viewed together, they justify the conclusion that Lo Piccolo was engaged with Casella and others in a joint enterprise. Lo Piccolo's involvement, demonstrated first by the evidence that he was engaged in the conspiracy, is overwhelmingly established when the hearsay references of Casella to his "connection" and "supplier," which then became admissible against Lo Piccolo, are considered.
 
 
 54
 But, as there was no evidence to show that Lo Piccolo knew that any of the drugs with which he or his fellow conspirators dealt were contraband, we can sustain his convictions only if we can find that he had possession of the drugs. The record fails to establish that Lo Piccolo ever possessed heroin as early as December 11, 1957, physically, or by controlling the disposition of it, or otherwise. The drugs sold on that date were delivered to the agents' room by Ignazio Orlando. While it is quite likely that Orlando got the room key from Lo Piccolo there is no evidence tending to show that he also obtained the heroin from him. Similarly, there is no evidence tending to establish that, with respect to the heroin sold on December 11, Lo Piccolo had that type of control which we have seen was exercised by the defendants Casella, D'Aria and Massi. Consequently, his conviction on Count Two must be reversed.
 
 
 55
 But as to Count Five, since it involved a period of time extending beyond December 11, there was indeed sufficient evidence to justify a finding that Lo Piccolo was in possession of narcotics. On December 19, after stating that he had to obtain opium from his connection's home, Casella was followed to Lo Piccolo's apartment where he engaged someone in conversation and obtained two cans of prepared opium. On January 20, Ignazio Orlando carried a package similar in appearance to others transported from Lorenzo Orlando's home to Lo Piccolo's apartment, and, immediately after Ignazio Orlando's arrival, Lo Piccolo closed his window blinds. Finally, on the evening of January 22, Lo Piccolo, together with Ignazio Orlando, carried a box, identical in size and shape to the one in which drugs were discovered in New Jersey a few hours later, from Lorenzo Orlando's home to an automobile. After placing the box in the automobile, the two men drove off. Looked at in the light of all the other evidence presented, any one of these occasions justifies, in our opinion, the conclusion that Lo Piccolo was, during the time in question, in actual possession of narcotics, a possession which he did not "explain."
 
 
 56
 E. Lorenzo Orlando.
 
 
 57
 Lorenzo Orlando was convicted under Count Five, the only count on which he was indicted. Although he argues strenuously to the contrary, we hold that the evidence was adequate to support his conviction. A large cache of narcotics was found in a locked room in his house and a key to the room was found in his clothing. His attempts at first to keep the agents out of this room and his later statement to them that the suitcase contained heroin, plainly demonstrate that he had knowledge of the stored narcotics. Also, he admitted ownership of them. The district court was not required to believe that this was simply a selfless lie made in an attempt to prevent the involvement of wife and son. The proof supports the conclusion that Lorenzo Orlando was a member of the conspiracy and in possession of the narcotics found in his attic room.
 
 
 58
 F. Nicholas Narducci and Anthony Edward Tarlentino.
 
 
 59
 The two defendants Nicholas Narducci and Anthony Edward Tarlentino appeared on the scene only briefly, on the night of January 20, 1958 and the morning of the following day. As a result of this brief appearance the Government charged in Count Five that they were members of the conspiracy, and in Count Four that on or about January 21, 1958 they "unlawfully, wilfully and knowingly did receive, possess, conceal and facilitate the transportation and concealment of a narcotic drug." The evidence presented by the Government shows that on the night in question Narducci was observed furtively attempting to remove a package containing narcotics from the trunk of a parked automobile. Tarlentino then met with Napolitano and Tolentino and explained to them that "the kid got scared and left the package in the car." The next morning, upon their arrest, Narducci impliedly admitted that he knew that the package contained narcotics, and Tarlentino detailed a false story with respect to his behavior. While only Narducci can be said to have admitted knowing that the package contained narcotics, it is inconceivable that he would know the contents of the package while Tarlentino, the man who made contact with Napolitano and Tolentino, did not.
 
 
 60
 This proof was sufficient to justify a finding that these two defendants as alleged in Count Five were members of the group and were attempting, pursuant to an understanding with others, to remove a package of narcotics from an automobile, but we must reverse their convictions because there was no evidence whatsoever to indicate that they had knowledge that the drugs in the package were contraband drugs, and because we are not able to say from this record that they were ever in possession, actual or constructive, of that package of narcotics or of any other narcotics handled by the group. The Government argues that Narducci's momentary grasp of the package constituted "possession" of it by him, and that at that moment the crimes with which he and Tarlentino were charged were completed. We cannot agree. A statutory presumption is valid only where there is a rational and not unreasonable connection between the ultimate fact to be presumed and the fact proved. Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904, supra. The crime punishable under section 174 is not the possession of narcotics, but rather the transporting, concealing, receiving, buying or selling of narcotics; and, consequently, in order to make the statutory presumption contained in that section meet the test of validity we must define "possession" as used therein so as to include only that type of control from which it could not unreasonably be inferred that the possessor was going to commit one or more of the specified acts which have been declared criminal. Narducci's grasp of the package was clearly not such possession, for he voluntarily released it one brief moment later.
 
 II. The Defense of Entrapment
 
 61
 In his opening remarks to the district court, the defendant Santore raised the issue of entrapment by the federal agents. Having been rebuffed below, he now urges that defense upon us.
 
 
 62
 According to the Government's proof, Agent Michael Picini first met Santore on February 26, 1957 at the 39th Ward Republican Club in Philadelphia. At that meeting Picini stated that he had been recommended to Santore by a Baltimore friend of Santore named "T" and that he was interested in purchasing some heroin. Santore asked the agent whom he knew in Philadelphia and whether he was acquainted with Harry Riccobene. Picini replied that he had heard of Riccobene but did not know him. Santore then asked Picini how much heroin he wanted to buy, and upon being told a quarter kilo, stated that "his people" would not sell less than half a kilo. But after Picini told him that he would not make any large purchases until he first "tried the stuff," Santore set a price of $3,500 for a quarter kilo. Santore then told Picini where he could be reached, and Picini agreed to "let him know in a couple of days." All of this conversation took place in the bar there with other patrons standing 15 to 20 feet away.
 
 
 63
 The next meeting occurred on March 4, 1957, at the same place. Apparently this time it was Santore who broached the subject of narcotics. He asked Picini if he was still interested in purchasing heroin, and told the agent to move out of the Essex Hotel because there "was too much law around there." Picini at that time was living in Philadelphia.
 
 
 64
 The parties met again, for a third time, on March 8, 1957. At this meeting Santore was accompanied by Frank Valle, and after the introductions Santore said to Valle, "This is the man I was talking to you about." Valle then inquired as to how much "stuff" Picini wanted to buy. Picini told him, and Valle then stated that Picini should call him that evening. Picini called as directed, but Valle told him that his connection was out of town and could not be reached.
 
 
 65
 On March 20, 1957 Picini again met Santore and Valle and accompanied them to a Chinese restaurant. At this meeting Santore stated that he had arranged for Picini to meet Harry Riccobene's brother that evening and asked for an advance of $200. That evening Picini went with Agent Marshall to the 39th Ward Independent Republican Club. Santore led them into the kitchen, asked them for and obtained the $200, and stated that while the proposed meeting could not be had as planned that evening, definite arrangements had been made for "a buy."
 
 
 66
 On the following evening, another meeting took place at the same club. Santore announced that the heroin would be $525 an ounce; and, after some protestations as to the cost of it, Picini agreed to take six ounces. He then paid Santore $2,950 and they made arrangements to meet the next morning.
 
 
 67
 At the morning meeting Santore said "that his people had been delayed in New York and that the stuff * * * would be in Philadelphia some time that night." About 5:45 A.M. on March 23rd Santore called Picini and told him to go to the club. Picini accompanied by Marshall obeyed. At the club Santore got into the agents' car and directed them to a street intersection. When they arrived there Santore told them that the drugs were on the side porch of a luncheonette. Picini obtained them there. When they separated Santore told the agents to keep in touch with him.
 
 
 68
 Santore first attacks the plausibility of this evidence and mainly centers this attack upon the testimony relative to the initial meeting. While the writer of this opinion is astonished to learn how easily Agent Picini was able to effectively make his initial contact with Santore, we cannot say that the district court, after viewing the witness-stand behavior of Agent Picini and of the defendant who testified in his own behalf, was unjustified in believing that what Picini stated occurred actually did occur as stated. Certainly more than a reaction of mild astonishment would be required for us to intervene and set aside this factfinding conclusion of an experienced trial judge. The Government's version of events subsequent to February 26 is readily believable and of course thereby lends plausibility to the testimony relative to the initial contact.
 
 
 69
 Accepting the facts as presented by the Government the facts do not support the defense of entrapment. It is well settled that government officers may employ artifice or stratagem to catch those engaged in criminal activities. Sherman v. United States, 1958, 356 U. S. 369, 78 S.Ct. 819, 821, 2 L.Ed.2d 848; Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. "Entrapment occurs only when the criminal conduct was `the product of the creative activity' of law-enforcement officials. * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." Sherman v. United States, supra, at 372. Santore is clearly within the latter category. He was not reluctant to negotiate a sale of narcotics at his first meeting with Agent Picini. At their second meeting he raised the subject himself. The district court quite properly found that Picini did not persuade Santore to commit the crime and that he only provided the defendant with an opportunity which the latter was ready and willing to take advantage of. Masciale v. United States, 1958, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859, rehearing denied 1958, 357 U.S. 933, 78 S.Ct. 1367, 2 L. Ed.2d 1375.
 
 
 70
 Santore further maintains that even if he was not entrapped with respect to the first sale, we must find that the agents' "continued inducement" of him to arrange sale after sale entrapped him. True, the agents expressed dissatisfaction with the product supplied by Valle and Malfi, and they insisted that Santore take them to his New York connection. However, in view of defendant's apparent ready willingness to find new suppliers, and arrange new sales, we cannot say that that inducement constituted entrapment. We think the test to be applied to these subsequent relations is the same test that governs an initial contact between a government agent and a suspected criminal. The public policy which, within limits, permits government agents to practice the art of deception is not dissipated when one member of a criminal group has been discovered and discovery of the others through that contact is desired.
 
 
 71
 III. The Legality of the Search of Lorenzo Orlando's Home
 
 
 72
 The defendant Lorenzo Orlando moved the district court to suppress all the evidence found by the agents during their search of his attic apartment and basement on January 23, 1958. He alleged that the search warrant under which the agents gained admission was illegal and that consequently the narcotics, equipment, etc. were the fruits of an illegal search and seizure. The district court denied this motion, and defendant assigns that denial as error on this appeal.
 
 
 73
 There most assuredly was probable cause for the issuance of the warrant. Twice the agents observed that shortly after a light went on in the second floor of the house at 164 Hill Street a package, subsequently found to contain narcotics, was carried out. The warrant stated that the applicant for the warrant had reason to believe that illegal narcotics were to be found "on the premises known as 164 Hill Street, Elmont, Long Island, New York, being a one family house, in the Eastern District of New York." However, it is defendant's contention that since the house was not a one-family house, but two-family, the basement and second floor being occupied by Orlando and his wife and the first floor by a family named Drago, the warrant did not describe the place to be searched with that particularity required by the Fourth Amendment. While there might be merit to this position were we dealing with the case of an ordinary multiple dwelling building, see United States v. Hinton, 7 Cir., 1955, 219 F.2d 324 we think that under the circumstances here the district court's ruling must be upheld.
 
 
 74
 The house at 164 Hill Street is to all outward appearances a one-family house with a front door and a side door, and it had always been registered with the local authorities as a one-family dwelling. A few years prior to the search the interior of the house was renovated and subdivided by Orlando, but, in contravention of local ordinances, no permission to do so was obtained from the proper authorities. Consequently no notice of this subdivision was ever given to the local officials.
 
 
 75
 In view of these facts we think that the issued warrant described the premises to be searched with that "practical accuracy" we have held to be necessary. United States v. Fitzmaurice, 2 Cir., 1930, 45 F.2d 133. The description in the warrant was in accordance with the outward appearance of the structure, cf. Carney v. United States, 6 Cir., 1935, 79 F.2d 821, and in view of the concealment by Orlando of the interior alteration made by him it would be absurd to say that the Government was on notice as to it. The agents were not warned of a possible dual occupancy of the house until after they had shown the copy of the warrant to Orlando and had entered inside. At that moment it was too late for them, consistent with the success of their mission, to have retreated and obtained a new warrant.
 
 IV. The Grand Jury Minutes
 
 76
 The defendants also seek a new trial on the ground that the district court committed reversible error in its rulings with respect to the grand jury testimony of government witnesses. In the court below the defendants requested that the grand jury minutes be given them directly under Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and 18 U.S.C. § 3500; or that, at the very least, the district judge read the minutes to determine whether there were any inconsistencies between the testimony the witnesses gave before the grand jury and that adduced at the trial. Both of these requests were refused.
 
 
 77
 We have previously held that neither Jencks nor 18 U.S.C. § 3500 applies to grand jury minutes, United States v. Spangelet, 2 Cir., 1958, 258 F.2d 338; United States v. Angelet, 2 Cir., 1958, 255 F.2d 383; and the Supreme Court has recently expressed its agreement with this approach, Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed. 2d 1323. Accordingly defendants' first request was quite properly denied. However, defendants' second request appears to be in accord with the position we took in Spangelet. There we said:
 
 
 78
 "The district judge held that neither Jencks nor the statute enacted by Congress immediately after the Jencks decision, 18 U.S.C.A. § 3500, authorized handing over grand jury testimony to defendant's counsel. The judge thereupon utilized the procedure which had prevailed before the Jencks case and inspected the grand jury testimony in camera. Finding no inconsistencies he then refused to give the transcript to the defense.
 
 
 79
 "We hold that the district judge followed the proper procedure with respect to grand jury minutes." 258 F.2d at page 339.
 
 
 80
 In accord with our holding in Spangelet, therefore, we issued an order to the trial judge requiring him to read the grand jury minutes and to certify to this court whether, in his judgment, there were inconsistencies in the testimony of witnesses who testified both before the grand jury and at trial to warrant turning over to the defendants those portions of the grand jury minutes in which the inconsistencies appeared; and, if there were such inconsistencies, whether in his judgment the failure to turn over those portions of the minutes containing them prejudiced the defense. In compliance with this order the trial judge certified that:
 
 
 81
 "[A]ny inconsistencies that exist between the testimony of those witnesses who testified both before the Grand Jury and at the trial are of such a minor nature that I would not have ordered that they be delivered to defense counsel. I further certify that in my judgment the defense was in no way prejudiced by my refusal to order that they be surrendered to them."
 
 
 82
 We have reviewed both the trial transcript and the grand jury minutes, and we are in agreement with this certification. Accordingly, we hold that while the district court did not comply with the defendants' several requests that the grand jury minutes be turned over to defense counsel, and did not examine those minutes in camera during the trial in accord with the practice we approved in Spangelet, the defendants are not entitled to new trials. If the trial judge had read the grand jury minutes when requested to do so he would have ruled that the defendants could not examine them. In the present state of the law, this case not having been a jury case, we hold that this compliance with Spangelet by the trier of both law and facts is all the defendants are entitled to.
 
 V. Miscellaneous Points
 
 83
 The remaining points raised by defendants do not require extended discussion, and will be dealt with briefly. The first of these is the contention that the Government's proof revealed a prejudicial variance in that it showed the existence of multiple conspiracies rather than the one conspiracy that was charged in the indictment. Citing Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, defendants urge reversal on this ground. We do not agree that the proof presented revealed the existence of more than one conspiracy. For as we said in United States v. Rich, 2 Cir., 1959, 262 F.2d 415, 418:
 
 
 84
 "The courts have [held] that persons can be involved in a conspiracy even though they do not know all the other members of the conspiracy or participate in each phase. Recognition is thus given to reality, namely, that there must of necessity be a division of labor and function by those engaged in this business. If there be knowledge by the individual defendant that he is a participant in a general plan designed to place narcotics in the hands of ultimate users, the courts have held that such persons may be deemed to be regarded as accredited members of the conspiracy."
 
 
 85
 And see Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, certiorari denied 1957, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed. 2d 597, rehearing denied 1957, 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 725; United States v. Tramaglino, 2 Cir., 1952, 197 F.2d 928, certiorari denied 1932, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670; United States v. Bruno, 2 Cir., 1939, 105 F.2d 921, reversed on other grounds 1939, 308 U.S. 287, 60 S.Ct. 198, 84 L. Ed. 257. But even if we thought otherwise, the doctrine of Kotteakos would be inapplicable here. In that case the evidence showed the existence of at least eight separate conspiracies, and the court's decision was predicated upon possible confusion in the minds of the jurors. Here, trial was to the court without jury, there were at most only two separate groups of co-conspirators, and the district judge was not confused as to the situation. In pronouncing judgment on the defendants he said:
 
 
 86
 "I hold that all of the defendants were involved in one conspiracy. In view of the kind of operation and the nature of the product within this conspiracy, I feel that the case of United States v. Bruno [2 Cir.], 105 F.2d 921, provides a guide. Thus it is not necessary that each defendant know the others or the existence of the others in the conspiracy, that knowledge being implied from the size and the character of the conspiracy. But if two separate conspiracies should be vaguely found or inferred, one involving Narducci, Tarlentino, Ignazio Lawrence Orlando, Lorenzo Orlando, Joseph Lo Piccolo, plus the two fugitives, and the other consisting of Ignazio Lawrence Orlando, Joseph Lo Piccolo, Lorenzo Orlando, Peter Casella, James Santore, James Leo Massi and Emilio D'Aria, it is my finding that the evidence against these defendants is sufficient to find them guilty, considering against each only the statements of the conspirators involved and the evidence adduced by the Government as to such conspirators."
 
 
 87
 The defendants Lorenzo Orlando, D'Aria and Massi argue that the district judge committed error when he denied a motion for a mistrial made after the trial was temporarily postponed at a time when the two Orlandos were taken to the Eastern District of New York and there adjudged guilty on a charge of possession of the narcotics discovered in Lorenzo Orlando's home. The basis of this contention, as we understand it, is that since this postponement occurred on July 3, the day the trial ended and judgment was to be pronounced, it was so likely that the district judge's decision would be influenced by the judgment rendered in the Eastern District that he should have had the trial begin anew. We cannot agree. There was substantial evidence against each of the Orlandos. And the district judge expressly noted that he was in no way concerned with the decision in the Eastern District but had resolved the issues before him on the basis of the evidence presented in his own court. We must credit our federal trial judges with more independence of judgment than this argument suggests.
 
 
 88
 The defendant Casella contends that the trial judge maintained a prejudicial attitude toward the defendants, and that this attitude, expressed in various comments, deprived them of a fair trial. However, when the remarks are looked at in context they do not support this contention, and we have not found other indications of such an attitude on the part of the trial judge. On the contrary, it is our considered judgment that he conducted a long and difficult trial in a fair and proper manner.
 
 
 89
 Joseph Lo Piccolo rested his case at the end of the Government's case. He argues that the district court committed reversible error as to him because it ruled that, though he put in no evidence in support of his cause, evidence damaging to him elicited from defense witnesses called by the other defendants would be binding upon him. We need not pass upon the merits of this contention for, in announcing its decision with respect to those defendants who presented no evidence in their own behalf, the court stated that it found them guilty on the basis of the Government's proof alone. Our study and analysis of the evidence demonstrate to us the accuracy of this observation.
 
 
 90
 Casella and Santore make various contentions with respect to their sentences. Casella argues that he was but an aider and abettor, the conspiracy charge was in his case simply an alternative form of charging the substantive offenses, and therefore the imposition of a separate consecutive sentence on the conspiracy count was improper. But this too is an argument with which we need not deal. Casella was sentenced to terms of twenty years on each of Counts One and Two to run concurrently with each other; and twenty years each on Count Three and Count Five to run concurrently with each other, but consecutively to the serving of the sentences on Counts One and Two. Thus Casella's argument overlooks the fact that one of the terms of imprisonment ordered to run consecutively embraces a substantive count and that the sentence on the conspiracy count runs concurrently with that term.
 
 
 91
 Santore argues that all of the various sales of narcotics in which he participated in Pennsylvania, New Jersey and New York constituted a single continuous transaction, and that it was improper for the district court to have ordered the twenty year sentence imposed upon him to run consecutively to the sentences imposed in Pennsylvania and New Jersey for the violations committed in those states. But while these sales may have all been part of one overall continuous transaction, they were each a crime punishable separately under 21 U.S.C.A. § 174. And it is well settled that a court may provide for a sentence to begin at the expiration of one then being served. Ponzi v. Fessenden, 1922, 258 U.S. 254, 265, 42 S.Ct. 309, 66 L.Ed. 607; Wall v. Hudspeth, 10 Cir., 1940, 108 F.2d 865; Carroll v. Zerbst, 10 Cir., 1935, 76 F.2d 961; Ex Parte Lamar, 2 Cir., 1921, 274 F. 160, 176, 177, 24 A.L.R. 864, affirmed 1923, 260 U.S. 711, 43 S.Ct. 251, 67 L.Ed. 476; United States v. Wright, D.C.E.D.Ill.1944, 56 F.Supp. 489.
 
 
 92
 Defendants Santore, Orlando, Tarlentino and Narducci were represented on appeal by The Legal Aid Society, Thomas A. Shaw, Jr., of counsel for Santore and Orlando, and Stuart H. Johnson, Jr., of counsel for Tarlentino and Narducci. We express our gratitude to these lawyers who, in volunteering their services to assist impecunious defendants, not only render invaluable aid to the court but exemplify standards of high professional responsibility.
 
 
 93
 We unanimously affirm the convictions of Peter Casella and of Lorenzo Orlando; and of James Santore upon Counts One, Three and Five, and of Joseph Lo Piccolo on Count Five. We affirm the convictions of Emilio D'Aria and James Leo Massi, Judge L. HAND dissenting. We reverse the convictions of Anthony Edward Tarlentino and Nicholas Narducci, and the convictions of James Santore and Joseph Paul Lo Piccolo on Count Two, Judge BYERS dissenting.
 
 
 
 Notes:
 
 
 [1]
 The pertinent portion of 21 U.S.C.A. § 173 reads as follows:
 "§ 173. Importation of narcotic drugs prohibited; exceptions; crude opium for manufacture of heroin; forfeitures. It is unlawful to import or bring any narcotic drug into the United States or any territory under its control or jurisdiction; except that such amounts of crude opium and coca leaves as the board finds to be necessary to provide for medical and legitimate uses only, may be imported and brought into the United States or such territory under such regulations as the board shall prescribe, but no crude opium may be imported or brought in for the purpose of manufacturing heroin. All narcotic drugs imported under such regulations shall be subject to the duties which are now or may hereafter be imposed upon such drugs when imported."
 
 
 [2]
 21 U.S.C.A. § 174 reads as follows:
 "§ 174. Same; penalty; evidence
 "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.
 "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."
 
 
 
 94
 L. HAND, Circuit Judge (dissenting as to D'Aria and Massi).
 
 
 95
 I agree with the opinion of Judge Waterman with one exception: i. e., I do not think that "possession" in the last paragraph of Sec. 174 of Title 21, U.S. Code, includes "constructive possession." I understand by "possession," as that term is commonly used in the law, either actual custody of the chattel, or at least that relation to the custodian that makes him unconditionally subject to the "possessor's" demand for custody. I am of course aware that the outlines of the conception are not sharply drawn, but it seems to me that D'Aria and Massi did not have "possession" in the sense required. In the case at bar by adding "constructive possession" we give very important added advantage procedurally to the case for the prosecution, which it seems to me is unwarranted for reasons I shall try to state.
 
 
 96
 The paragraph in question creates more than a "presumption" for that would require no more than that the accused should put in some evidence that he had not dealt with the drugs in any of the ways forbidden. As I read the paragraph, "possession" by itself will support a conviction unless the accused "explains the possession to the satisfaction of the jury," which in the end comes to saying that the burden of proof shifts to him to establish his innocence, once he is shown, not only to be in "possession" at the time of the forbidden dealings, but to have ever been in possession in the past. Assuming that such a statute would be constitutional, which, I submit, is not wholly free from doubt, it appears to me that at least the language should be explicit that "possession" has some other than the usual meaning. We must remember further that, not only is this a criminal statute, but that the penalties prescribed are extremely heavy.
 
 
 97
 Moreover, I find confirmation for my interpretation in the fact that when in 1914, five years later, Congress made dealing in narcotics lawful under specified conditions, among which was the "registry" of the dealers (Sec. 4722, Title 26, U.S.Code), it provided that "possession or control" should be presumed to be a violation of that act (Sec. 4724 (c), Title 26, U.S.Code), unless the dealer had "registered"; it did not shift the burden of proof. It is therefore clear that in that statute at least "possession" was used in its ordinary sense, and that, when Congress meant to include "constructive possession," it added the phrase, "or control."
 
 
 98
 I agree that it does not necessarily follow that in 1909 the word may not have been used more comprehensively; but I submit that it is significant that, when dealing with the same subject matter — narcotic drugs — the same word was used so as to exclude "constructive possession." Moreover, Sec. 4734 of Title 26 provides that Sec. 4722 — among other sections — shall not "impair, alter, amend, or repeal" any part of the Act of 1914. I agree that this language means that whatever was "possession" under Sec. 174 remains "possession" under the Act of 1914, but, I cannot see how that helps to define what was "possession" under Sec. 174. Not only does it beg the question to assume that the word had the same meaning in both statutes, but it makes redundant the addition of the words, "or control," in 1914. I can see no reason to imply that these were added merely to make assurance doubly sure. As I have said, the Act of 1909 imposed much heavier penalties, and procedural consequences of the "possession" were more drastic.
 
 
 99
 It is true that we have twice spoken as though "constructive possession" was enough under Sec. 174 (United States v. Cohen, 124 F.2d 164; United States v. Moia, 251 F.2d 255); but in both cases, "possession," stricti juris, was proved and what we said was obiter. On the other hand in United States v. Landry, 257 F.2d 425 (1958) the Seventh Circuit decided that control by the accused over the custodian of narcotics was not alone enough to put the accused in "possession" under Sec. 174. In that case the control was more immediate than that of D'Aria and Massi in the case at bar. The point appears to me therefore to be still open for discussion.
 
 
 100
 To sum up I do not say that it would be unconstitutional to make "possession or control" enough to shift the burden of proof; but, I do think that if the intent was so far reaching, it was necessary to be more explicit as was done in the Act of 1914.
 
 
 101
 BYERS, District Judge (concurring in part, and dissenting in part).
 
 
 102
 The travail of this adjudication has wrought a diversity of opinion in the court as to correct disposition of the appeal of certain of the defendants; as a result it seems to be requisite that the views of each component of the court be made a matter of record.
 
 
 103
 I concur in the affirmance of the convictions of Casella, D'Aria, Massi and Orlando.
 
 
 104
 I concur in the conviction of Santore on counts One, Three and Five, and dissent from the reversal of his conviction on count Two, and would affirm as to that.
 
 
 105
 I concur in the conviction of Lo Piccolo on count Five, and dissent from the reversal as to him on count Two, and would affirm.
 
 
 106
 I dissent from the reversal of the convictions of Narducci and Tarlentino.
 
 
 107
 The reasons upon which the foregoing are based can be briefly stated:
 
 
 108
 At the outset it is to be remembered that this court is unanimous in holding that there was one conspiracy as charged in the indictment, and that all of these defendants were parties to it. The analogy to a partnership is of course not complete, but that terminology is deemed to be sufficiently apt to indicate the true relationship of defendants one to the other.
 
 
 109
 Since the agreement which the law perceives under such circumstances becomes visible in the acts of those who carry it into effect, the precise roles assigned to each are seldom if ever entirely revealed.
 
 
 110
 This means that it is an overambitious task to spell out to a nicety the exact allocation of duties of each individual in the performance of the joint task. It may be doubted if the inner workings of such a conspiracy are strictly organized. Probably individual performance is improvised on consent, according to the exigencies attending the delivery of a given package of the contraband.
 
 
 111
 If the foregoing betrays a reasonably correct understanding of such operations as this court is now dealing with, it would seem to follow that the conspiracy itself is the basic element of the picture as a whole, and once that has been found to be present, such details as "constructive possession" as opposed to manual possession, are of unimportant significance.
 
 
 112
 It is with true deference that I venture to suggest that Judge HAND'S conception of "possession" as meaning "either actual custody of the chattel, or at least that relation to the custodian that makes him unconditionally subject to the `possessor's' demand for custody" is not dispositive in dealing with the members of such a criminal conspiracy as this.
 
 
 113
 In such a matter it seems to me that it is each individual's relation to the contraband (not to one who may be temporarily its custodian) upon which the issue of possession turns. Since the contraband is in the joint custody of all, and since it may pass from hand to hand within the group — and probably does — as circumstances may dictate, the prosecution should not be called upon to prove who it was at a given instant of time that possessed any capacity to make the demand referred to in the foregoing quotation.
 
 
 114
 The enforcing authorities ought not to be required at all times to be adept at reading the details of what is by its very nature, a thimblerig enterprise.
 
 
 115
 Once such a joint and coordinated activity has been disclosed, as it was in this case, the later developments must be judged in the light of the partnership relationship so established, because as the law sees it, the conspiracy is not obliterated by the substantive offenses. It seems that the partnership relation, not that of principal and agent, points the path to decision.
 
 
 116
 That is in outline the premise from which the conclusions hereinabove stated are reached.
 
 
 117
 Santore.
 
 
 118
 This dissent has to do with the reversal as to count Two, the sale of December 11, 1957 which was accomplished through the placing of 16 ounces 390 grains of heroin in a bureau drawer in the agents' room at the Hotel Edison. To quote from Judge Waterman's careful recital of the facts, Casella had visited Lo Piccolo's apartment where the contraband had been cached:
 
 
 119
 "Upon his (Casella's) return to the hotel where Santore, Marshall (agent) and Picini (agent) were waiting he said that the drugs would be delivered that evening at 9:00 P.M. It was agreed (emphasis supplied) that the drugs were to be placed in a bureau drawer in the agents' room at the Hotel Edison while they were absent from it."
 
 Again:
 
 120
 "No one had gone into the agents' room except Ignazio Orlando. When the agents looked in the bureau they found a package containing a half-kilo of heroin. Picini then, at Casella's direction, gave $6,000 to Santore."
 
 
 121
 To me, the above recited agreement to which Santore was evidently a party, and the finding of his membership in the conspiracy, plus the payment to him of $6,000, made him an active and controlling participant in the elaborately concealed delivery.
 
 
 122
 He had sufficient control over that movement to collect the proceeds upon its successful completion. In other words, he was of managerial status in the enterprise, and should be so dealt with.
 
 
 123
 Lo Piccolo.
 
 
 124
 Again there is a reversal as to count Two (the said sale of December 11, 1957).
 
 
 125
 This was the subject of a conversation on the previous evening; the said agents and Santore and Casella, while dining, were discussing a purchase of heroin. Lo Piccolo entered the restaurant, and Casella joined him but apart from the others. After those two talked, Casella returned to the group and stated that all desired arrangements had been made.
 
 
 126
 The court's opinion contains the following:
 
 
 127
 "Despite his vehement protestations to the contrary, there is no doubt in our minds that the Government established his participation in that sale (Dec. 11, 1957) and that he was a member of the peddling conspiracy."
 
 
 128
 Despite the foregoing, the opinion later says: that there was no evidence that Lo Piccolo ever possessed heroin as early as December 11, 1957, physically, or by controlling the disposition of it, or otherwise.
 
 
 129
 It seems to me that the foregoing is inconsistent with the evidence. The heroin is shown to have been removed from Lo Piccolo's apartment by young Orlando. Casella did not report to the agents on December 11 that the heroin would be delivered at the agents' room as has been stated, until he had visited the apartment building where Lo Piccolo lived. If Lo Piccolo did not have custody and control over his own apartment, it is to be supposed that he would have submitted testimony to that effect. Of course the version that young Orlando would have given, touching his removal of the contraband from Lo Piccolo's apartment and delivery to the agents' room, has not been revealed, but in my opinion it was not needed.
 
 
 130
 Lo Piccolo's place in the conspiracy having been shown, it matters not whether he secreted the heroin as shown, of his own volition, or because Casella told him to. While it was in his apartment, he had sufficient possession of it to enable him to summon the authorities to relieve him of it, or otherwise dispose of it so as to frustrate the purpose of his talk on the previous evening with Casella. Of course he did neither.
 
 
 131
 It is required of a trial judge that he be fair and impartial, but not that he be feeble-minded.
 
 
 132
 I think Judge Noonan was right in convicting Lo Piccolo on this count, and therefore I would affirm.
 
 
 133
 Tarlentino and Narducci.
 
 
 134
 This court reverses as to counts Four and Five. The former charges these defendants with possession on January 21, 1958 of over six pounds of heroin, and with the conspiracy as charged in count Five.
 
 
 135
 As to the latter, this court finds these defendants to have been guilty, but nonetheless reverses their conviction. I can imagine no more triumphant non-sequitur.
 
 
 136
 In dealing with count Four, it is to be remembered that the said package of heroin was found in Napolitano's (not a defendant named) car on January 21, 1958. The facts show that on the previous evening these defendants drove to the place where Napolitano's car (in which the package had been placed) was parked; Tarlentino remained in the car in which they arrived while Narducci went to that of Napolitano, opened the trunk, lifted the package, and while in the act of so doing became aware of the presence of certain agents, dropped the package back into the trunk, and rejoined Tarlentino.
 
 
 137
 Thus the character and contents of the package have been shown, and the conduct of these two defendants in seeking to further its delivery is clearly revealed. Since it is familiar law that success need not attend the object of a conspiracy in order to establish its existence, I fail to see how the reversal as to the Fifth count can be justified.
 
 
 138
 The court's opinion states that "there was no evidence whatsoever to indicate that they had knowledge that the drugs in the package were contraband drugs, and because we are not able to say from the record that they were ever in possession, actual or constructive, of that package * * *".
 
 
 139
 As to the possession, there was a joint effort to further delivery, by the approach to Napolitano's car. If they had not known what was in its trunk, the errand was of no apparent purpose. The grasping of the package by Narducci was either with knowledge of its character, or in ignorance of it. There is no middle ground. That temporary possession was surrendered, but for a brief period of time it existed. The replacement of the package was consistent only with a purpose of concealment, and otherwise would not have been resorted to.
 
 
 140
 This circumstantial evidence was not consistent with innocence in any degree that is perceptible to me.
 
 
 141
 Thus as to these defendants I would affirm as to both counts.
 
 
 142
 In sum, it seems to the writer that the case comes before this court clothed with the usual immunity from reversal in the absence of a showing that the decision of the trial judge was clearly erroneous. To my mind it was clearly correct, and should be affirmed in its entirety.
 
 Upon Rehearing in Banc
 
 143
 Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY and SMITH, Circuit Judges.
 
 
 144
 LUMBARD, Chief Judge.
 
 
 145
 After the original panel, consisting of Judges Hand, Waterman and Byers, filed their opinions on October 2, 1959, the United States petitioned the court for rehearing in banc. Believing the questions raised to be of importance in the administration of the federal narcotics laws, a majority of the active circuit judges, Judges Clark and Waterman dissenting, on March 9, 1960, granted the petition. Reargument as to all appellants, except Lorenzo Orlando, was heard on March 16, 1960 by all the then active judges of this court.[1] We have reviewed all the convictions. This court differs with the conclusions of the original panel only with respect to Santore and Lo Piccolo on Count II, and we affirm the convictions on that Count.
 
 
 146
 We first consider Count II which charged Santore, Casella, Lo Piccolo and Ignazio Orlando[2] with the sale of 16 ounces of heroin on December 11, 1957. We briefly summarize so much of the evidence of the activities of the conspirators as sheds light on our consideration of this Count. Quotation marks are used when quoting from Judge Waterman's opinion filed October 2, 1959.
 
 
 147
 Santore and Casella were principal members of a group which was dealing in the illegal sale of large quantities of heroin in Philadelphia and New York City. In early 1957, Santore supplied agents Picini and Marshall with heroin through Philadelphia drug traffickers. The agents told Santore that they were not satisfied with the quality of the drugs, and they "insisted that Santore take them directly to his New York `connection.'" Santore then introduced the agents to Casella who, in Santore's presence, boasted that he could supply heroin in "`amounts anywhere from half a kilo to a ton * * * with the quality just as it comes off the boat.' * * *" Santore and Casella arranged to sell over 17 ounces of heroin to the agents in New York on October 21, 1957. When this sale was consummated, Santore physically handled the drugs. This sale is the basis for Count I of the indictment.
 
 
 148
 Thereafter, "during the month of November the agents and Santore and Casella discussed the possibility of a partnership for the sale of opium — from Turkey and the best available `called red Turkey smoking opium' — but nothing came of the discussions. The agents desired to see the opium `sample,' but Santore indicated a delivery of one would be delayed. Toward the end of that month, however, at Santore's urging, tentative arrangements were made for another purchase of heroin." On December 10, the two agents met with Santore and Casella at the Hotel Edison on West 47th Street in New York to discuss the details of the heroin purchase. While the four were "at dinner that evening at a restaurant Casella announced that he had to call his `connection.' After telephoning, he stated that his connection * * * was the same person who had supplied the heroin for the October 21 sale." Shortly thereafter Lo Piccolo entered the restaurant and Casella immediately joined him. The agents testified that from where they were sitting they could see Lo Piccolo enter and leave. "After some discussion with Lo Piccolo, Casella returned to the table and said that everything had been arranged and that all he needed to know was the quantity to be delivered."
 
 
 149
 The next day final arrangements for delivery of a half kilo of heroin were worked out by Casella. He visited the apartment house where Lo Piccolo lived, and upon his return he reported to the agents "that the drugs would be delivered that evening at 9:00 P.M." Agreement of the agents as to the details was obtained by Casella in Santore's presence. Casella obtained the key to the agents' hotel room and delivered it to Lo Piccolo's apartment which was some distance from the hotel. When he returned he said that "he had given the key to his supplier and that the delivery would be on schedule." Casella, Santore and the two agents then went to dinner, after which they returned to the hotel. Santore and one agent remained in the lobby, while Casella and the other stood on the street in front of the hotel.
 
 
 150
 At about 9 P.M. Ignazio Orlando entered the agents' hotel room and delivered the heroin. He obtained entrance to the room with the key which Casella had previously delivered to Lo Piccolo's apartment. Casella saw Ignazio Orlando as he was leaving the hotel, and he told one of the agents that the delivery of narcotics had been made.
 
 
 151
 "Ignazio Orlando then got into a car in which Lo Piccolo was already seated and drove to the latter's apartment building. There [Ignazio] Orlando alighted, went into the basement garage, got into his own car, and drove away. Lo Piccolo drove off in the car they both had been in."
 
 
 152
 Meanwhile, the agents proceeded to their hotel room where they found a half kilo of heroin. Thereafter, one of the agents, "at Casella's direction, gave $6,000 to Santore." Santore then delivered $5,500 in accordance with telephoned instructions and kept $500 for himself. This sale is the basis for Count II of the indictment, and is the one that directly concerns us.
 
 
 153
 It is clear that Ignazio Orlando, who delivered the heroin, had actual possession of the drugs. Accordingly, he is chargeable with knowledge of the illegal importation of the heroin by reasons of the presumption of 21 U.S.C.A. § 174, which in part reads:
 
 
 154
 "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *
 
 
 155
 "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."
 
 
 156
 As to neither Lo Piccolo nor Santore was there eyewitness testimony that he had actual physical possession of the heroin. However, Lo Piccolo's control over the arrangements for the particular sale is attested to by the visits Casella made to his apartment both before and after reporting to the agents how delivery would be made. It appears possible, if not probable, that the narcotics were brought to Lo Piccolo's apartment by Ignazio Orlando, the courier for the conspiracy, and never left his possession before they were deposited in the agents' hotel room. The proof points clearly, however, to Lo Piccolo's supervision over the entire errand, even to the extent of his accompanying Orlando to the hotel and waiting outside in his car (which was used for the trip) while Orlando deposited the goods in the room. As constructive possession is enough to bring the presumption into play, the conviction of Lo Piccolo is affirmed. United States v. Cox, 2 Cir., 1960, 277 F.2d 302; Cellino v. United States, 9 Cir., 1960, 276 F.2d 941; United States v. Maroy, 7 Cir., 1957, 248 F.2d 663, certiorari denied 1958, 355 U.S. 931, 78 S.Ct. 412, 2 L.Ed.2d 414. The evidence as to Casella was also sufficient to warrant a finding of his constructive possession.
 
 
 157
 Santore, however, acted in no such supervisory capacity. His participation, even had it merely consisted of receipt of the sale price and its delivery in accord with telephoned instructions, would bring him within the terms of the sanction provided by § 174 against one who "facilitates the * * * sale of any such narcotic drug," Pon Wing Quong v. United States, 9 Cir., 1940, 111 F.2d 751, were it not for the added requirement that the facilitator know "the same to have been imported or brought into the United States contrary to law." It is because of the failure to show knowledge of importation that the original panel reversed Santore's conviction on Count II.
 
 
 158
 Nonetheless, Santore did actively assist the parties making the sale by arranging the meeting on December 10, participating in the preliminary discussion, collecting the price (of which $500 went to him for his role in bringing the parties together), and transmitting the funds as directed by the unknown caller. At the meeting held in the restaurant on December 10, if not before, he learned the identity of Casella's "connection" who had control over the drugs. In this guise, his association with the transaction is substantial and "purposive" enough to categorize him as an aider and abettor under 18 U.S.C. § 2[3] and the standard traditionally applied by this court. United States v. Peoni, 2 Cir., 1938, 100 F.2d 401. Congress has seen fit, however, to make knowledge of illegal importation an essential element of this crime. The question that now presents itself is whether, in order to convict one who purposefully aids and abets others in the sale of narcotics which he knows they possess, it is necessary to show either that he personally had physical or constructive possession of the drugs or that he knew they had been imported. Three judges of this court, Judges Moore, Smith and the writer, hold that such proof is not necessary.[4] Our three colleagues disagree.
 
 
 159
 The presumption established by § 174 does, in terms, apply only to "the defendant [who] is shown to have or to have had possession of the narcotic drugs,"[5] but it would be less than reasonable to assume that Congress intended only those who lay their hands on the goods to bear the burden of explaining while others who manage to avoid contact with the contraband drugs may go free absent any proof that they knew it was imported. Applying the presumption to all the principals in the sale who know that a drug is possessed by one of them is in accord with reason and common sense. To do otherwise would be to undermine the parity of treatment which Congress has prescribed for all the participants in a crime who come within 18 U.S.C. § 2. Each principal must, of course, be given the opportunity afforded the possessor under § 174 — that of explaining the origin of the drugs. But it is hardly likely that the courier who temporarily exercises custody over the narcotics will be better able to reveal their innocent source than will any of the other principals. The rational basis for the presumption in § 174, which constitutionally justifies shifting the burden of proof to the defendant-possessor, is that it is common knowledge that virtually all narcotic drugs must be imported into the United States. Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904. This premise is as rationally applicable to those principals who have not touched the contraband but know of its possession as to those who may have had it in their physical custody.[6]
 
 
 160
 Judge Waterman maintains that § 174 is "comprehensive" and that Congress did not mean to have 18 U.S.C. § 2 engrafted upon it. The term "facilitation," however, has always been construed as covering a broader range than the general aiding-and-abetting provision of the Criminal Code. Pon Wing Quong v. United States, 9 Cir., 1940, 111 F.2d 751; United States v. One 1950 Chevrolet 4-Door Sedan, etc., 10 Cir., 1954, 215 F.2d 482.[7] By prohibiting "facilitation" in § 174, therefore, Congress did not reveal any clear purpose to exclude 18 U.S.C. § 2 from the complex of federal narcotics laws; rather its intent appears to have been to extend the coverage of these laws to those not otherwise within the Criminal Code's definition of principal or accessory. Thus, the presumption in § 174 would apply to all those shown to have had physical or constructive possession and to all principals who knew of such possession. A mere "facilitator" or an accessory after the fact who is not shown to have had possession would not have the statutory presumption cast upon him. As to such co-venturers, Congress has chosen to require proof of knowledge on their part that the drugs were imported.
 
 
 161
 Both this court and others have, in the past, assumed that any principal who knows of the operation of the conspiracy is impressed with the presumption of § 174 even without any evidence of physical or constructive possession. See United States v. Morris, 2 Cir., 1959, 269 F.2d 100, certiorari denied 1959, 361 U.S. 885, 80 S.Ct. 159, 4 L.Ed.2d 122; United States v. Alexander, 7 Cir., 1955, 219 F.2d 225. This guiding principle was most clearly set forth in this court's opinion in United States v. Cohen, 2 Cir., 1941, 124 F.2d 164, certiorari denied Bernstein v. United States, 1942, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210. There Judge Augustus Hand, writing also for Judges Learned Hand and Swan, said at page 165 of 124 F.2d:
 
 
 162
 "Under the first statute (21 U.S.C. § 174) we have quoted it was only necessary to show possession of the narcotics to establish guilt and under the second statute (18 U.S.C. § 550, now 18 U.S.C. § 2), making an abettor a principal it was not necessary that each of the defendants should have had the narcotics, but only that one or more of them had possession while the others aided in the illicit transaction to which that possession was incidental."
 
 
 163
 Here it is quite clear that Santore aided and abetted the illegal conduct of the others who had possession. He knew of their possession and that such possession was for the purpose of furthering a joint illegal venture.
 
 
 164
 Accordingly, we affirm the convictions of Casella, Lo Piccolo and Santore on Count II for the sale of heroin on December 11, 1957.
 
 
 165
 As to the conspiracy Count V, there was ample evidence to support the convictions of Santore, Casella, D'Aria, Massi and Lo Piccolo.
 
 
 166
 We next consider the convictions of Tarlentino and Narducci on Counts IV and V. As the evidence as to these defendants is fully discussed in Judge Waterman's opinion of October 2, 1959, we need not repeat it.
 
 
 167
 We all agree that the convictions of Tarlentino and Narducci on Count V for conspiracy should be reversed for the reasons stated by us with respect to the appellant Snyder in United States v. Stromberg, 2 Cir., 268 F.2d 256, certiorari denied 1959, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102. We held there at page 267 that, "participation in a single isolated transaction was an insufficient basis upon which to bottom an inference of continuing participation in a conspiracy." See also United States v. Aviles, 2 Cir., 274 F.2d 179, 189-190, certiorari denied Barcellona v. United States, 1960, 362 U.S. 982, 80 S.Ct. 1073, 4 L.Ed.2d 1016.
 
 
 168
 As to Count IV a majority of the court votes to reverse the conviction of Tarlentino and Narducci for the reasons given in the opinions of Judges Waterman and Friendly. Judge Moore and this writer vote to affirm Tarlentino's conviction on this Count, finding that he aided and abetted the concealment and transportation of narcotics by driving Narducci to the area where the heroin was to be picked up, driving Narducci away following his failure to get the narcotics, going on to meet Napolitano and Tolentino, reporting the failure to them, and discussing with them what was to be done next. Narducci, on the other hand, was not shown to have associated himself sufficiently with the enterprise to qualify as a principal. Whether this abortive attempt to transport the drugs would come within the "facilitation" provision of § 174 we need not decide. We agree with the original panel's opinion that his momentary grasp did not amount to the possession required in order to activate the statutory presumption against him. Judge Moore dissents and votes to affirm Narducci's conviction on Count IV as he feels that Narducci's actions were sufficient to justify his conviction on the substantive Count as an aider and abettor.
 
 
 169
 We all agree that the convictions of D'Aria and Massi should be affirmed on Count I as well as Count V for the reasons stated by Judge Waterman in his opinion of October 2, 1959.
 
 
 170
 In summary, we affirm the convictions of all the defendants as to whom reargument was granted, except that we reverse the convictions of Narducci and Tarlentino on Counts IV and V.
 
 
 
 Notes:
 
 
 [1]
 Judge Smith became a member of the court on September 14, 1960 and has considered the case on the record and briefs
 
 
 [2]
 Ignazio Orlando is not appealing his convictions on Counts II, IV, and V. He is not to be confused with Lorenzo Orlando who appealed his conviction on Count V, the conspiracy charge
 
 
 [3]
 18 U.S.C. § 2 provides:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."
 
 
 [4]
 While we rest our affirmance as to Casella and Santore primarily on the application of the § 174 presumption, we also find that as to these defendants there is sufficient evidence apart from this unrebutted presumption. That Casella and Santore had knowledge the heroin the group was selling was imported is quite clear. On October 16, 1957, less than two months before the sale described in Count II, Casella, in the presence of Santore, stated to the agents that he could supply heroin "in amounts anywhere from half a kilo to a ton * * with quality just as it comes off the boat * * *". Since it is common knowledge that practically all heroin is imported, it is clear "off the boat" meant imported into the United States
 
 
 [5]
 This legislative presumption was first drafted on July 7, 1866, by a Conference Committee, called together to iron out differences between House and Senate bills, both entitled, "An Act Further to prevent Smuggling and for other purposes." Congressional Globe, 39th Cong., Sess. 1, p. 3501. The original version, enacted into law on July 18, 1866, is almost identical to the present provision. It reads "in all cases where the possession of such goods shall be shown to be in the defendant, or where the defendant shall be shown to have had possession therefor, such possession shall be deemed evidence sufficient to authorize conviction, unless the defendant shall explain the possession to the satisfaction of the jury." Congressional Globe, supra, p. 3650
 This provision, with slight modifications, was incorporated in several subsequent amendments, and in 1909 was applied to the importation of opium and opium derivatives, and in 1922 to all narcotic drugs. See 14 Stat. 179 (1866); Rev.Stat. § 3082 (1875); 19 Stat. 214 (1876); 35 Stat. 614 (1909); 38 Stat. 275 (1914); 42 Stat. 596 (1922); 43 Stat. 657 (1924); 65 Stat. 767 (1951); 70 Stat. 570 (1956).
 
 
 [6]
 Judges Clark, Waterman and Friendly say that Congress required knowledge of illegal importation as a condition for conviction of any importer, receiver, concealer, purchaser, or seller of narcotics, and that to hold one guilty of aiding and abetting he must be shown to have shared the same knowledge or intent as is required of the principal. To us, however, this seems to be an oversimplification. By reason of the statutory presumption, Congress has, in effect, said that to be found guilty a defendant must be shown to have had either knowledge or unexplained possession. It follows that if a principal has knowledge or unexplained possession then an aider and abetter who knows of the principal's possession comes within the purview of 18 U.S.C. § 2
 
 
 [7]
 The Pon Wing Quong case does not, as Judge Waterman maintains, hold that "facilitating" has no meaning broader than aiding-and-abetting. The Ninth Circuit said: "Since the term `facilitate' seems not to have any special legal meaning, the framers of the statute must have had in mind the common and ordinary definition as expressed by a standard dictionary. Quoting from Webster's Unabridged Dictionary, `facilitate' is defined as follows: `To make easy or less difficult; to free from difficulty or impediment; as to facilitate the execution of a task.'" 111 F.2d at page 756. That this definition is broader than the standards for aiding-and-abetting set down in this circuit in United States v. Peoni, 2 Cir., 1938, 100 F.2d 401, seems beyond doubt
 Moreover, Judge Waterman in fact agrees with us when he says that "no lesser proof is required to convict" the principals named in the statute — i. e., receivers, concealers, purchasers, or sellers — than is required to convict a facilitator. All we hold is that the unexplained possession of one of these principals may be attributed to a knowing aider-and-abetter but not to a facilitator. Thus, the prosecution of a facilitator places the same burden on the government as the prosecution of a principal.
 
 
 
 171
 WATERMAN, Circuit Judge (concurring in part and dissenting in part).
 
 
 172
 I adhere to the views I expressed in the panel opinion I filed on October 2, 1959. Accordingly, I agree with all the results reached by the in banc court, except that I dissent from the decision of a majority of this court affirming the convictions of Santore and Lo Piccolo on Count II.
 
 
 173
 The interpretation Judge Hand and I placed upon the events of December 10 and 11, 1957 that gave rise to the Count II allegations is set forth in my opinion of October 2, 1959. No useful purpose will be served by now pointing out how that interpretation differs from the several interpretations reached by other members of the present in banc court.
 
 
 174
 I do feel compelled to state my reasons for disagreeing with the view of three of my colleagues with reference to the inter-relationship of 18 U.S.C. § 2 and 21 U.S. C.A. § 174. They appear to be of the belief that proof that one defendant possessed narcotics would be sufficient to sustain the conviction under 21 U.S.C.A. § 174 of all who aid and abet that one defendant, even though the alleged abettors never had physical or constructive possession of the narcotics. I submit, first, that when one invokes the general aiding-and-abetting statute, 18 U.S.C. § 2, one offends the statutory scheme of 21 U. S.C.A. § 174; and, second, that even if this invocation were proper it would in no way lessen the need to prove that the alleged abettor possessed the narcotics. Therefore, I fear that if this view should become established in this or any other circuit, it would only serve further to confuse an already untidy area of the law.
 
 
 175
 Section 174 forbids: (1) knowing illegal importation of narcotics; (2) receipt, concealment, purchase or sale of narcotics known to have been illegally imported; (3) facilitation, in any manner, of the transportation, concealment or sale of narcotics knowing the narcotics to have been illegally imported; and (4) any conspiracy to commit any of the above enumerated acts. At the risk of understatement one may say that this detailed statute is comprehensive! To engraft the general provisions of 18 U.S. C. § 2 onto this statute, so clearly an all-inclusive and self-contained one, would be to increase the duplications that already exist. For example, I doubt that the line between aiding and abetting on the one hand, and conspiracy on the other, has ever been satisfactorily drawn. Compare Cosgrove v. United States, 9 Cir., 1954, 224 F.2d 146, 150-155 and Pereira v. United States, 1954, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435. How much more difficult it will be to draw a distinction between, for instance, aiding and abetting the sale of narcotics, and the facilitation, in any manner, of such a sale. My three colleagues would make such a distinction, for the statutory scheme they envisage would require proof of possession when a defendant is charged with the facilitation of the narcotics traffic but not when he is accused of aiding and abetting this traffic. I cannot join in attributing such eccentricity to Congress.[1]
 
 
 176
 I have a further difficulty with reliance upon 18 U.S.C. § 2, even if one assumes that 21 U.S.C.A. § 174 is not all-inclusive, and 18 U.S.C. § 2 may be employed to buttress a charge of violating 21 U.S.C. A. § 174.[2] To be guilty of aiding and abetting the commission of a crime of a type that requires that the principal have a specific intent or have specific knowledge, the defendant abettor must be shown to have shared fully in that intent or knowledge. Johnson v. United States, 8 Cir., 1952, 195 F.2d 673, 675; Bacon v. United States, 10 Cir., 1942, 127 F.2d 985, 987; Morei v. United States, 6 Cir., 1942, 127 F.2d 827, 830-831. See also Ramirez v. Chavez, 1951, 71 Ariz. 239, 226 P.2d 143, 146; Combs v. Commonwealth, 1928, 224 Ky. 653, 6 S.W.2d 1082, 1084; Osborne v. Baughman, 1927, 85 Cal.App. 224, 259 P. 70. A fact required to be proved in order to convict a principal under 21 U.S.C.A. § 174 is his knowledge that the narcotics were illegally imported. This knowledge may either be proved directly or by the defendant's failure satisfactorily to explain his possession of the narcotics. Inasmuch as the purported aider-and-abettor must be shown to have had this same knowledge, it also follows that his knowledge can be proved only in these two ways. Thus under 21 U.S.C.A. § 174 personal possession, whether physical or otherwise, is as essential to the conviction of an offending aider and abettor as it is to the conviction as a principal of one who commits a specific offense.
 
 
 177
 I concede that some support for my colleagues' position is to be found in language in United States v. Cohen, 2 Cir., 1942, 124 F.2d 164, 165, certiorari denied Bernstein v. United States, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210, rehearing denied 316 U.S. 707, 62 S.Ct. 941, 86 L.Ed. 1774. However, the language relied upon has never been followed prior to the present case. Recently the identical argument which my colleagues here would accept was advanced by the Government in Cellino v. United States, 9 Cir., 1960, 276 F.2d 941. There the conviction was affirmed, but the affirmance was carefully based upon the finding that the defendant himself possessed the narcotics in the sense of exercising dominion and control over them. In a careful analysis the Ninth Circuit pointed out that in the Cohen case there was some evidence of possession in each of the defendants charged, 276 F.2d 941, 945. I subscribe to this analysis of the Cohen case and to the refusal to utilize 18 U.S. C. § 2 in prosecutions under 21 U.S.C.A. § 174.
 
 
 178
 I am authorized to state that Judge CLARK concurs in this opinion.
 
 
 
 Notes:
 
 
 [1]
 Three of my colleagues read the narcotics laws so as to require proof of possession or proof of actual knowledge of illegal importation in order to convict a facilitator but not to require such proof in order to convict an aider or an abettor. They begin with the premise that facilitation covers a "broader range" than aiding-and-abetting, citing Pon Wing Quong v. United States, 9 Cir., 1940, 111 F.2d 751. But that case teaches, see page 756, that the term "facilitation" has no technical legal meaning. How then can the premise be valid, and it be said that "facilitation" is broader or narrower than "aiding-and-abetting"? See United States v. Peoni, 2 Cir., 100 F.2d 401, 402. But even if one assumes the validity of their premise there are further difficulties. These colleagues maintain that it is rational to require more rigorous proof to convict for facilitation because that term embraces a wider range of activities than the term aiding-and-abetting embraces. However, under Section 174 proof of possession or actual knowledge of illegal importation is required to convict a receiver, a concealer, a purchaser, or a seller of narcotics. Surely each of these last four named activities embraces a narrower range of specific activity than the aiding-and-abetting of any of them embraces, and yet no lesser proof is required to convict for these offenses than is required to convict for facilitation
 
 
 [2]
 Judge Friendly discusses this point in his separate opinion, and I subscribe to his analysis thereof
 
 
 
 179
 FRIENDLY, Circuit Judge.
 
 
 180
 I join in Chief Judge LUMBARD'S opinion with respect to the conviction of Lo Piccolo on Count II; the evidence supported findings both that the heroin delivered by Ignazio Orlando on December 11 had been in Lo Piccolo's possession in his apartment and that Orlando transported the heroin on Lo Piccolo's instructions so that Orlando's possession would also be Lo Piccolo's. I join also in the affirmance of Santore's conviction on Count II. Santore facilitated the transportation and sale of heroin on December 11, and there was direct evidence that he knew he was trafficking in a drug that "comes off the boat"; hence it is unnecessary to consider whether he was sufficiently a partner that the possession of others may be attributed to him. However, I think the convictions of Narducci and Tarlentino on Count IV must be reversed, as well as those on the conspiracy count.
 
 
 181
 While I see no reason to read into the aiding and abetting statute, 18 U.S.C. § 2, an exception making it inapplicable to the offense defined by 21 U.S.C.A. § 174, this by no means ends the matter. Congress has chosen to make knowledge that the narcotics were imported or brought into the United States an essential element of the latter offense; and it would be altogether incongruous that a person could be convicted as an aider or abettor, whom 18 U.S.C. § 2 makes "punishable as a principal," without proof of an element essential to convicting the principal himself, especially when 21 U.S. C.A. § 174 requires such proof in the case of one charged as a facilitator. It is true that, as said by Judge Augustus N. Hand in United States v. Cohen, 2 Cir., 1941, 124 F.2d 164, 165, certiorari denied Bernstein v. United States, 1942, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210, rehearing denied 316 U.S. 707, 62 S.Ct. 941, 86 L.Ed. 1774, under the aiding and abetting statute it is "not necessary that each of the defendants should have had the narcotics, but only that one or more of them had possession while the others aided in the illicit transaction to which that possession was incidental." However, Judge Hand did not say that a defendant prosecuted under 21 U.S.C.A. § 174 may be convicted as an aider or abettor without a showing either of possession or of knowledge that the narcotics were "imported or brought into the United States contrary to law." Examination of the record and briefs reveals that this point was not raised, and neither of the two cases cited in support of the statement, United States v. Hodorowicz, 7 Cir., 1939, 105 F.2d 218, 220, certiorari denied 1939, 308 U.S. 584, 585, 60 S.Ct. 108, 84 L.Ed. 489, 490, and Vilson v. United States, 9 Cir., 1932, 61 F.2d 901, dealt with that problem.
 
 
 182
 Assuming in the government's favor that Tarlentino's report of the failure of the Narducci-Tarlentino attempt to pick up the heroin would otherwise suffice to make him a facilitator of transportation or concealment under 21 U.S.C.A. § 174 or an aider and abettor under 18 U.S.C. § 2, it is plain that Tarlentino never had possession of the narcotics and the government was thus obliged to present evidence sufficient to support an inference that he knew the narcotics had been "imported or brought into the United States contrary to law." Just how much evidence is required for this need not be here determined — the government argues that none at all need be offered when the defendant knows the narcotic is heroin since the importation of heroin or of opium for manufacture into heroin is absolutely forbidden, 21 U.S.C.A. § 173. It is enough here that the statute cannot be deemed satisfied by showing only that a defendant knew he was aiding a narcotics transaction, since such a reading would give no effect to the words "knowing the same to have been imported or brought into the United States contrary to law" and would render the paragraph as to the evidentiary effect of possession largely supererogatory. There was no evidence that Tarlentino had any knowledge of the source of the narcotics in Napolitano's car, that he was experienced about narcotics in general, or that he knew these narcotics were heroin. The government thus failed to discharge its burden.
 
 
 183
 The same considerations apply to Narducci, save for the contention that his grasp of the package, for a period testified by the government agent to have been "less than half a minute," constituted "possession" and thus relieved the government of the need of proving knowledge of the narcotics' source. To hold this would give the act of touching an unwarranted talismanic effect. Possession implies ability to exercise control; Narducci was thwarted before achieving this. Decisions, both by divided courts, that fingerprint evidence is enough to permit an inference of possession, Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391, 393, certiorari denied 1950, 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631; United States v. Pisano, 7 Cir., 1951, 193 F.2d 361, 365, are not to the contrary; in such cases there was no evidence that the contact was but momentary, as there was here.
 
 
 184
 SMITH, Circuit Judge.
 
 
 185
 I concur in the result reached by the majority, affirming the convictions of all the defendants, except the convictions of Narducci and Tarlentino on Counts IV and V, which are reversed.
 
 
 186
 On Count II, the majority holds Santore as an aider and abettor under 18 U. S.C. § 2, applying the presumption of knowledge of illegal importation supplied by 21 U.S.C.A. § 174 to Santore on the theory that the statute makes the possession of the principal that of the aider and abettor, although not of mere facilitators or accessories after the fact. Under the circumstances here, the statute may well be held applicable to Santore as an aider and abettor, although reliance on it is not here essential since he had actual knowledge of illegal importation. Here possession is not an essential element of the crime of selling, transporting or concealing, but knowledge of illegal importation is, and possession raises the presumption of such knowledge. I agree that if possession by a principal is an essential part of a particular sale, concealment, etc. (or conspiracy to sell or conceal), and such possession by the principal is known to his partner in the enterprise to be essential to the sale or concealment toward which he has conspired or in which he has taken a purposive part as an aider or abettor, the possession of one should be attributed to the other and the presumption brought into play, both in the establishment of the necessary scienter on the conspiracy count and on the substantive counts.
 
 
 187
 We need not determine whether there may be situations where one could be a facilitator or aider and abettor of a sale or concealment without knowledge of possession by his principal, for such knowledge was plainly had by Santore and Lo Piccolo on Count II. Moreover, even without the aider and abettor statute, possession by one partner in a common scheme such as the scheme to distribute narcotics which was the essential core of the conspiracy proved here, where possession by one of the partners on the occasion in question was a necessary part of the common scheme, is the possession of all the partners. Cf. Pinkerton v. United States, 1946, 328 U.S. 640, 66 S. Ct. 1180, 90 L.Ed. 1489; Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, 116; Carpenter v. United States, 4 Cir., 1959, 264 F.2d 565, 572. This is an actual physical possession by the partnership. Santore was more than a fringe member of the conspiracy. He brought the plan into being. Possession by any of the partners, necessary to fruition of the plan, should be held his possession. I agree that the statutory presumption may be applied to Santore, and also, that both Santore and Casella were shown to have actual knowledge of the importation, so that their convictions on Count II may be upheld regardless of the statutory presumption.
 
 
 188
 As to Lo Piccolo on Count II, it is doubtful if the proof supports a finding of personal possession by him in his apartment, but I agree that the aider and abettor statute as well as partnership in the common scheme, which required possession in Orlando on this occasion, makes the actual possession by Orlando that of Lo Piccolo.
 
 
 189
 Tarlentino and Narducci were involved in the single attempt on the evening of January 20 to pick up a package from the trunk of Napolitano's car. They are not sufficiently shown to have knowledge of the common scheme. There is no evidence that they had actual possession or control of the package other than Narducci's momentary contact, and lacking knowing participation in the partnership, possession by others is not possession by Tarlentino or Narducci. Nor is there evidence that they had actual knowledge of the heroin content of the package or that it had been imported contrary to law.
 
 
 190
 I concur, therefore, in the reversal of the convictions of Tarlentino and Narducci on Counts IV and V.